## AMES *v.* DREW.

One authorized his debtor to leave a note, or the money, with his son—*held*, no authority could be implied from this for the son to sell the note to a stranger.

No authority to sell a note of his father can be implied from the fact that the son had, in several instances, borrowed money of another person, for his father, who afterwards repaid the money.

Neither can such authority be inferred from the fact, that the son had the note in his possession, though that would be evidence of power to receive the money, if the note was indorsed in blank.

APPEAL from the judgment of a justice of the peace. The writ was dated February 26th, 1853, and contained one general count for money had and received, money lent, &c.

On the trial, the plaintiff introduced evidence tending to show that in November, 1852, he lent the defendant nine dollars, but there being no writing materials at hand, no note was taken for the same; that he subsequently demanded the money of the defendant, and he refused to pay it.

The defence to the action was, that the plaintiff's son, William J. Ames, a minor, about sixteen or seventeen years of age, as the agent of his father, took a note of the defendant for the money, a few weeks after it was lent, running to the plaintiff, or his order, and sold the note without its being indorsed, to one Calley, and that he was authorized by his father so to sell and transfer the same in the manner in which he did.

To sustain the defence, the defendant introduced as a witness Bartlett Huse, who testified, in substance, that he knew William J. Ames, and that he lived with his father, the plaintiff, until the fall of 1852; that he came to the witness to borrow money for his father at three different times; first time was on the 2d of December, 1851; he wanted $11, and said his father sent him to borrow the money; witness was owing the plaintiff at the time. On the 2d of May following, he let the young man have $2,

and also some hay; he said he came by his father's directions. In October following he came for $3, and the witness let him have it. The plaintiff afterwards accounted and settled for the several sums. That the boy enjoyed his father's confidence till the latter part of the fall of 1852. Soon after that, the boy came with a note against the defendant to sell the witness. The boy's father had told the witness, the same morning, that the boy had got the note. The witness did not see the note, but he asked the boy what authority he had to sell it. He answered that he let the defendant have the money himself, and, moreover, it was his, for he had worked for it. He said he had got the note, and it was his, and he could sell it that night for $9. Witness met Marston Calley that same night, and had a conversation with him about it.

On cross-examination, the witness testified that he did not recollect of any other times than those stated, when he let the boy have money; that the plaintiff generally did his own business, and looked after his own notes and his own money.

When the witness saw the plaintiff, on the morning that the boy came to him to sell the note, the plaintiff complained about many things, and then spoke about this note at the close, how the boy had been to Drew and obtained the note. Witness told the boy not to sell the note to any one, but it never occurred to the witness that he had not the right to sell it. The boy said Dr. Smith had been at his father's, and his father said Drew should pay the note over again, and witness then advised the boy not to sell the note.

It appeared by the cross-examination of the boy, who was a witness for the plaintiff, that he procured a note of the defendant for the money, payable to the plaintiff, or his order, and that he afterwards sold it to Marston Calley for $8, but did not indorse it. The boy also testified that he was

not the agent of his father, and had no authority from his father either to obtain the note or to sell it.

Thomas Neal, another witness for the defendant, testified that in January, 1853, after Calley bought the note, he saw the parties together. The plaintiff said Calley did wrong in buying the note, as he knew the situation of the plaintiff's family. Witness asked the plaintiff how the boy knew that Drew had the money. Plaintiff said he was unwell at the time, and the boy went and got the money for him in the other room, and that was the way the boy knew Drew had the money. He said, further, that he afterwards met Drew in the village, and Drew wanted him to give him a note at the time; but he did not wish to stop, and said Drew might let the boy have the note or the money, or leave it at the house, but to be sure and not leave it unless one or the other was there. He said there was no one there in whom he had any confidence but the boy.

It further appeared from the testimony of this witness, upon examination by the plaintiff, that the plaintiff notified Drew not to pay the note to Calley, and offered to indemnify him against having to pay the note to Calley, if he would pay it to the plaintiff; and at the same time the defendant said he was willing to pay it once, and not more, and that he wanted to pay it to the right person.

Levi B. Drew testified that the parties were, both of them, his uncles; that the plaintiff put much confidence in his son, in business matters, and he believed he had seen the son have his father's keys. Witness heard a conversation between the parties in January or February, 1853. Plaintiff made the remark that he wished the defendant to pay the money to him, and not to Calley; and he forbid him to pay it to Calley, and offered to indemnify him against Calley. Drew said, I do not know; I do not wish to get myself into trouble; let it alone a few days, perhaps the boy will pay it. Drew said, you know I went to your house for the

money, and you sent the boy to your chest to get it, and you said " leave the note with me or William."

On cross-examination, the witness testified that the plaintiff likes to know how his business is done, and that he never knew of his giving authority to any of his boys to collect any notes for him.

Marston Calley, another witness for the defendant, testified that he purchased the note of the boy in December, 1852, or January, 1853. The note was dated November 5, 1852, was payable to the plaintiff, or his order, for $9, on demand, with interest, annually, and not indorsed. The witness saw the boy, and asked him if he had the note, and was going to sell it. He said he had it, and was going to sell it, and that he would take $8 for it. Witness made a bargain for it for that sum. The boy then took out the note, and witness read it, and saw that it was payable to the boy's father, and said to the boy the note is running to your father, not to you. The boy said he knew that, but he let Drew have the money, and it was his money. Witness took the note and paid the money. He had a conversation with Bartlett Huse the night before, and, in consequence of that conversation, he asked the boy in regard to the note.

Witness saw the plaintiff a week or two after he bought the note. He was telling over his troubles, and at last brought up about this note. He wanted to know why the witness bought the note, and the witness told him that he did it to save costs to Drew, a neighbor of his. Plaintiff wanted the witness to go to the boy, and scare him to give up the money. Witness told him that he should not do any thing of the kind; that he did not wish to make any pretence about it. Witness thinks the plaintiff did not claim the note of him, and he did not know of any serious trouble before that time. Witness had not, when he bought the note, any notice that the boy had not authority to sell it.

Drew paid witness the note a short time after he pur-
chased it of the boy. After Drew took up the note, the
plaintiff was at the house of the witness, to see whether it
was payable to order or bearer.

On cross-examination, the witness testified that he did not
know as Ames was aware that he had the note till he spoke
to him about it.

Drew did not pay the witness the money for the note, but
gave him a note for the amount of the principal and inter-
est, which note has not been paid.

The plaintiff excepted to all of the evidence of the defen-
dant, as being incompetent to show that William J. Ames
was his agent, or had any authority to obtain the note, but
especially as being incompetent to show any authority to
sell and transfer the note. The evidence was, however, ad-
mitted, subject to the exception.

The court, among other things, instructed the jury that
they must be satisfied that the boy had authority from his
father to take the note, and also authority to sell and trans-
fer the note ; otherwise their verdict must be for the plaintiff.

The jury returned a verdict for the defendant, which the
plaintiff moved may be set aside for error in the admission
of the defendant's evidence, and also because the verdict is
against evidence.

*Burrows*, for the plaintiff.

1. The defendant's testimony was incompetent to show
an authority in the boy to sell the note. It was payable to
the order of the plaintiff, and not indorsed. It should have
been indorsed, or delivered by the person having the legal
interest. Parsons on Cont. 211; *Davis* v. *Lane*, 8 N. H.
Rep. 224. Authority to draw is not an authority to indorse.
*Robinson* v. *Yarrow*, 7 Taun. 455; *Kilgour* v. *Finlyson*, 1
H. B. 155. The finder of a lost note, payable to order, can
confer no title by delivery. 8 N. H. Rep. 224; Chit. on
Bills 92; *Mead* v. *Young*, 4 D. & E. 28.

A minor is not the general agent of his father. Even if he were so by parol, it would not authorize him to indorse the note, or confer title by delivery. Neither will a power of attorney, in all cases. *East India Co.* v. *Tritton*, 3 B. & C. 280. A party taking such note, not indorsed by the payee, should satisfy himself that the agent had power so to transfer the note. Chit. Bills 28, 30; *Atwood* v. *Munnings*, 7 B. & C. 278; 1 Taun. 347; *Hay* v. *Goldschmidt*, 2 Smith's Rep. 79.

If one take a note, on the ground that the agent had authority, implied or inferred, from the prior conduct of the principal, it must appear that it was so taken upon the faith of prior similar transactions. Chit. Bills 31; *Martin* v. *Great Falls M. Co.*, 9 N. H. Rep. 51. The testimony of Hughes and Calley comes within the principles of the case of *Lisbon* v. *Bath*, 1 Foster's Rep. 320.

2. The defendant's testimony was incompetent, because it was hearsay. Where a person is a competent witness to prove a fact, his declarations as to such fact are not admissible. *Ross* v. *Knight*, 6 N. H. Rep. 236; *Baker* v. *Briggs*, 8 Pick. 122; *Bank* v. *Woodward*, 5 N. H. Rep. 301. In last case, the court say : " Nothing is clearer than that the declarations of an agent cannot be received as evidence, in cases where he might be called in as a witness."

3. The verdict is against evidence, and may be set aside. 1 Foster's Rep. 320.

*N. B. Bryant*, for the defendant.

The court will not set aside a verdict as against evidence, merely because they might have arrived at a different result from that found by the jury, (*Lisbon* v. *Bath*, 3 Foster's Rep. 10,) nor where the credibility of the witnesses is to be considered, or presumptions are to be made and inferences drawn. *Ib.*

The general rule is, that a verdict, once found, shall stand. The setting it aside is the exception, and ought to be an

exception of almost rare and singular occurrence. *Wendell* v. *Safford*, 12 N. H. Rep. 177.

In the present case, there are many circumstances bearing upon the relations of the parties and the authority of the son, properly falling within the exclusive discretion of the jury.

It is said Calley was not acting on the faith of former acts of the agent, but, we contend, this was not material; the question is not here one of estoppel, but merely of the fact of the boy's authority to sell the note. The circumstances, we think, show that, though the boy denies it. He testifies he had no authority to sell the note, and it is said he is not contradicted, but he is contradicted as to so many circumstances that the jury might disregard his testimony.

Levi B. Drew testifies that the defendant told the plaintiff you said leave the note with me or William; and Neal testifies that the plaintiff said he told Drew he might let the boy have the note or the money. This is conclusive evidence that the boy had authority to take the note or the money, and the jury might find this a sufficient authority to take a note payable to himself. This would be, in effect, the same as an authority to transfer the note. The jury might infer, if he had a right to take the money on the note, he had authority to sell it.

The boy alleged, when he sold the note, that the money was his; it was a matter competent for the jury to consider whether he did not then tell the truth, especially as the plaintiff, in his conversation with Calley, did not claim any right to the possession of the note, when he desired him to scare the boy to give up the money.

Though slight, this evidence was competent, and if any of the evidence was competent, the verdict is conclusive.

BELL, J. The money loaned to the defendant was the plaintiff's property, the loan was made by him in his own right, the note was made payable to him, and the debt is due

to him, and must be recovered by him, unless he has transferred his interest in it, as the defendant contends, through the agency of his son. No unauthorized act of the son could, in any way, affect his rights. The question whether the boy had authority to transfer the note to Calley, was submitted to the jury, with proper instructions, and their decision is conclusive, because, as the defendant contends, the court will not, ordinarily, set aside a verdict, in a case where different persons might reasonably differ in their conclusions, merely because they would have arrived at a different result from that of the jury. *Wendell* v. *Safford*, 12 N. H. Rep. 178. The only question before us is the competency of the evidence laid before the jury to prove the authority.

There is here no direct proof of any authority given by the plaintiff to his son, to sell or transfer this note, or of any approval of his acts. Circumstances are relied upon which are supposed to be sufficient to justify the inference that he had such authority. The first of these is the evidence of Huse, who testifies to three instances in which the plaintiff had recognized his son as his agent to borrow money of the witness, by accounting and settling for it. It is clear that an agency may arise, by implication, from repeated acts done by the agent, with the tacit consent or acquiescence of the principal, but in every such case the authority implied is deemed to be limited to acts of the like nature, and to dealings of the same kind. Story on Agency 80; Lloyd's Paley on Agency 211. Thus an authority to sell goods in a shop, implied from the acquiescence of the owner, does not justify the inference of an authority to buy, for they are acts distinct in their nature, and not dependent upon or incidents of each other. Story on Agen. 83; Lloyd's Paley on Agen. 167. A clerk, intrusted to accept or indorse bills or notes, would not thereby possess an authority to purchase or sell goods for his principal. Story on Agency 84. An authority to sign notes cannot be inferred from a person's acting as clerk to a merchant. *Terry* v. *Fargo*, 10 Johns. 114. It

seems, therefore, clear to us that the only legitimate tendency of this evidence, relating to the borrowing of money, is to prove an authority or agency to borrow money. It is not evidence of an authority to accept bills, or indorse notes, in the case of the same person from whom money was borrowed, and it might well be doubted if it would be evidence of a power to borrow money of any other person, if unaccompanied by other circumstances. This evidence was, consequently, incompetent to prove a power to sell the note in question.

Neal, another witness, testified to a conversation between these parties, in which the plaintiff told the defendant that he had said he might let the boy have the note or the money, and L. B. Drew states a conversation between them, in which the defendant reminded the plaintiff that he said " leave the note with me or William." These declarations tend to prove not a general agency, but merely a special authority to receive this note or the money due on it. They tend to justify the defendant in giving his note to the son, and show that the note was in the possession of the son by his father's authority, and that the son might, perhaps, have rightfully received the money upon it. The mere fact of such possession of the note, if it had been payable to bearer, or had been indorsed in blank, would be *prima facie* evidence of an authority to receive payment. Chit. Bills 395. But an agent employed to make, or negotiate, or conclude a contract, is not as of course to be treated as having authority to receive payments under it. Stor. Ag. 88. An agent to receive payment may not receive it in any mode he chooses; he has ordinarily power to receive it *in money only*, and when and after it becomes due, and not before it becomes due. Stor. Ag. 88–9. Nor is he authorized to commute the debt for another thing, nor to compound it, or to release it upon a composition, or to submit the debt or demand to arbitration. Stor. Ag. 89. Neither the authority to receive the note nor the money as expressed, nor the im-

plied authority to receive payment, resulting from possession of the note, even if it had been indorsed, have any tendency to prove an agency or authority to sell the note at a discount, as was done in this case, nor to sell it at all.

The only further evidence is the testimony of Calley, who states that the plaintiff, in a conversation he had with him, did not claim the note of him, when he wished him to scare the boy to give up the money. But there is nothing in this conversation which can be construed into an approval or ratification of the boy's conduct, or admission that the boy had a right to sell the note.

It was immaterial whether the jury did or did not believe the testimony of the boy. He denied that he had any authority to sell the note. This testimony merely negatived a fact, which the defendant was bound to prove to establish his defence. If there was no legal evidence from other witnesses of his authority, a jury could not infer such authority from their disbelief of his evidence. Neither would the declarations made by the boy, at the time he sold the note to Calley, or when he offered it to Huse, be competent to prove any authority to sell the note, as agent of his father, if indeed they would alone be competent to prove anything, for he in terms claimed the right to sell the note, because it was his own property, and not in the character of an agent for his father.

There being then no competent evidence of any authority to sell this note,

*Verdict must be set aside.*